UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br>　　v.<br><br>KEITH LAMONTE RUSSELL,<br><br>　　　　　　　Defendant. | CASE NO. 2:23-cr-00142-TL<br><br>ORDER ON MOTION TO SUPPRESS EVIDENCE AND FOR *FRANKS* HEARING |

Defendant Keith Lamonte Russell is indicted on one count of Unlawful Possession of a Firearm, 18 U.S.C. § 922(g)(1). Dkt. No. 15. This matter is before the Court on Mr. Russell's Motion to Suppress Evidence and for *Franks* Hearing. Dkt. No. 35. Having reviewed the Government's response (Dkt. No. 45), Mr. Russell's reply (Dkt. No. 48), the Parties' supplemental briefing on marijuana DUI (Dkt. Nos. 77–78), and the relevant record, and having held an evidentiary hearing (Dkt. No. 88), the Court GRANTS the motion and SUPPRESSES evidence of the gun, blood testing, and all other evidence recovered incident to Mr. Russell's arrest.

# I. BACKGROUND

The Court makes the following findings of fact based on the documentary record presented with the Parties' briefing, as well as testimony elicited at the evidentiary hearing.

At approximately 1:20 a.m. on July 17, 2023, Officers Nicholas French and Matthew Lentz of the Seattle Police Department ("SPD") were on patrol in a marked police vehicle on Aurora Avenue in Seattle, Washington. While responding to a 911 call, the officers noticed a white Volvo sedan stopped in the middle of the roadway on 137th Street, in front of the Comfort Inn located there.[1] At approximately 1:30 a.m., after completing their 911 response, the officers were driving northbound on Aurora when they noticed the same vehicle in the same location. While the officers did not know where the vehicle was in the time between the first and second sightings, they decided to investigate further. Intending to conduct a stop of the Volvo, they turned right onto 137th, but as they turned around at the Comfort Inn, the Volvo drove away, turning southbound onto Aurora. The officers testified that the driver was under no obligation to stop at the time the Volvo pulled away. They also testified that the Volvo appeared to be moving fast, but they admitted that they could not determine if the Volvo was speeding at any time prior to them stopping the car.

The officers followed the Volvo for several blocks, during which time they did not observe any unusual, erratic, or illegal driving by the Volvo; on the contrary, fleet video shows that the Volvo properly changed lanes, using a turn signal. The windows of the Volvo were tinted to such a degree that the officers could not see inside the vehicle. The officers were also not able to see a license plate or temporary plate, so at 127th Street, they activated their lights to

---

[1] The owner of the Comfort Inn has filed multiple complaints with SPD concerning cars parking on the street, blocking traffic, and creating a road hazard.

1    initiate a traffic stop. The Volvo accordingly stopped at the next block at 125th Street,[2] stopping

2    in the left-turn lane at a red light, where Officers French and Lentz performed the traffic stop. At

3    the time, Aurora appeared busy, with multiple vehicles passing the Volvo on its right side.

4        Officer French also testified that shortly before the stop, he observed a hand sticking out

5    of the sunroof to toss something out. However, fleet video from the officers' patrol car does not

6    reflect this observation. On body-worn camera video, Officer French tells Officer Lentz that he

7    saw a hand sticking out but says nothing about an object being tossed. Officer French testified

8    that the fleet video quality is not very good.

9        The officers exited their patrol car and approached the Volvo together—Officer Lentz on

10   the driver side, Officer French on the passenger side. As they approached, they smelled burnt

11   marijuana coming from the vehicle. The driver of the vehicle, later identified as Mr. Russell, had

12   rolled down the driver's window and was sticking his hands out of the window. As Officer Lentz

13   approached, Mr. Russell stated that he was in the left lane because he was attempting to turn left

14   and pull over on the side street. He also identified himself as Mr. Russell and stated that he had

15   license, registration, and insurance.

16       Officer Lentz asked Mr. Russell to step out of the vehicle, which he did with no

17   difficulty. Mr. Russell continued to ask why he had been stopped, and Officer Lentz used his

18   flashlight to look inside the vehicle. Mr. Russell stated again that he was trying to turn left so he

19   could pull over on the side street, and Officer French stated that it was normally understood by

20   drivers to pull over to the right side when police ask them to stop.

21       Officer French asked Mr. Russell if he had any weapons, and Mr. Russell said no. Officer

22   French asked if the vehicle was registered to him and whether there was a license plate. Mr.

---

[2] Officer French testified that there is no 126th Street, or if there is, there is no lighted intersection there.

Russell stated that the vehicle was registered to him but that he was still waiting for a license plate. As he spoke, he tapped on the rear window to point out the posted temporary plate, which Officer French testified he noticed at that moment. Officer French then asked if he had registration; Mr. Russell said yes and asked if he could retrieve the registration. Officer French said he could and then walked back to the patrol car to look up Mr. Russell's license. During the license review, Officer French learned that Mr. Russell had felony convictions, though he did not communicate that information to Officer Lentz until after the arrest.

Meanwhile, as Mr. Russell turned back to the car, Officer Lentz asked where the registration was located. Mr. Russell said it was in his car and he was about to grab it. Officer Lentz responded, "Alright." Mr. Russell opened the door and sat in the driver's seat, leaving the front door ajar. Mr. Russell retrieved the registration documents and handed them to Officer Lentz, who stood by the rear driver-side passenger door as he reviewed the documents. Mr. Russell asked "why is all this extra stuff" when he has a license and registration. Officer Lentz stated that it was because of where Mr. Russell pulled over, which "made us nervous" as they could not see what was going on inside the vehicle. Mr. Russell stated, "Now you guys got me in the middle of the street." Officer Lentz reiterated that drivers should pull over to the right side and explained that there were safety concerns involved with conducting traffic stops. Mr. Russell stated he had not wanted to be on Aurora and had wanted to be on a side street instead. Officer Lentz asked where the license plate was, and Mr. Russell explained that it was awaiting pickup at the car dealership.

At that point, Officer French returned to the driver's side of the vehicle, standing next the rear passenger door. He asked Officer Lentz, "Do you smell any 450 on him," meaning marijuana or alcohol. Officer Lentz responded, "I can't tell," and stated that Mr. Russell was the registered owner of the vehicle. Officer French then walked forward, placed his right hand on the

car (with Mr. Russell's license in that hand), and placed his left hand on the driver door, pushing the driver-side door open further. Both officers testified that only after Officer French pushed the door open further was Officer Lentz was able to see a gun (a Walther 9mm semi-automatic pistol) on the floor of the vehicle under the driver's seat, though Officer Lentz did not communicate that discovery to Officer French until after the arrest.

Officer French asked Mr. Russell if he had anything to drink that night; Mr. Russell answered no. Officer French asked if he smoked any marijuana; Mr. Russell answered "not in the last two hours" and that he was "all the way focused." Officer French pointed out that he could see a package of marijuana in the front door cup holder. Mr. Russell showed a blunt to the officers and stated that it was "not even smoked" and he had not smoked it. Officer French asked again if there were weapons in the car; when Mr. Russell answered no, Officer French asked if he could check the car, and Mr. Russell declined to consent.

Officer Lentz asked Mr. Russell to get out of the car. Mr. Russell asked, "for what," and Officer Lentz asked again two more times to the same response. Officer French asked if he was refusing to get out; Mr. Russell said he was not refusing but also said again that he had license and registration. Mr. Russell then exited the vehicle and shut the driver-side door. Mr. Russell continued to state that he had proper documentation and stated, "You guys are violating my rights." Officer French responded that they were investigating a DUI.

Mr. Russell pointed out that the officers had not obtained a breath sample; Officer French asked if Mr. Russell would give one, and Mr. Russell said, "I will give you whatever you wish to have," before repeating that he had proper vehicle documentation and that the officers were not allowed to search his vehicle. Officer French then said, "Ok, let's walk over to the sidewalk," and Mr. Russell responded, "I'm not gonna allow him to go through my car. I'm gonna lock my car up." Officer French responded, "Not right now," and asked again when Mr. Russell last had

marijuana. Mr. Russell responded, "A while, maybe two, three hours ago." Officer French stated that he asked because Mr. Russell's eyes were "glassy" and "bloodshot." Mr. Russell stated, "I haven't had any marijuana in a while. I could pass the test, any test you wish me to pass." Officer French asked how much marijuana he smoked; Mr. Russell answered, "Today? Earlier today, maybe a blunt?" Officer French asked how much he usually smoked; Mr. Russell stated, "A couple of blunts." Officer French asked if he felt the effects of the marijuana for a long time; Mr. Russell stated, "Not after a couple of hours." Officer French stated that it seemed like Mr. Russell had smoked more recently than that, given his appearance and the smell of marijuana; Mr. Russell stated, "I haven't," and noted that the marijuana package was closed and the blunt had "no fire to it." At that point, Officer French placed Mr. Russell under arrest for marijuana DUI.[3] Officer French testified that he did not conduct field sobriety tests because Mr. Russell's behavior was inappropriate.

Later, Officer French submitted affidavits in support of search warrants for Mr. Russell's blood (for testing) and for the vehicle. Of note, Officer French stated in the affidavits that Mr. Russell had smoked "one hour" before the traffic stop, although Mr. Russell had stated two or three hours. Officer French testified that the discrepancy was simply a mistake.

## II.     LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b)(3)(C) requires that a request for "suppression of evidence" be raised "by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."

---

[3] Officer French testified that he found a marijuana cigarette when searching Mr. Russell incident to arrest. However, the cigarette was not collected as part of the evidence in this matter, and Officer French's incident report makes no mention of the cigarette. Nor could either officer remember the condition of the cigarette (whether it had been smoked or not). In any event, evidence recovered incident to arrest is not relevant to the issues decided below.

ORDER ON MOTION TO SUPPRESS EVIDENCE AND FOR FRANKS HEARING - 6

Under the exclusionary rule, evidence obtained in violation of a person's Fourth Amendment rights, including any "fruit of the poisonous tree," is excluded from a criminal trial. *United States v. Cervantes*, 703 F.3d 1135, 1138–39 (9th Cir. 2012); *see also Alderman v. United States*, 394 U.S. 165, 171 (1969) ("The exclusionary rule . . . excludes from a criminal trial any evidence seized from the defendant in violation of his Fourth Amendment rights. Fruits of such evidence are excluded as well." (citations omitted)).

## III.   DISCUSSION

Mr. Russell appears to raise five grounds for the suppression of evidence: (1) there was no valid basis for the traffic stop (Dkt. No. 35 at 12–13); (2) the stop was unreasonably prolonged (*id.* at 13–17); (3) Mr. Russell's vehicle was unlawfully searched (*id.* at 17–20); (4) there was no probable cause to arrest Mr. Russell for marijuana DUI (*id.* at 20–21); and (5) the search warrant was invalid (*id.* at 21–22). The Government opposes on all grounds. *See* Dkt. No. 45. The Court considers each argument in turn.

**A.   Basis for the Initial Stop**

In his briefing, Mr. Russell appears to suggest that the officers may not have had a proper basis to conduct a traffic stop. *See* Dkt. No. 35 at 12–13. The Government responds that multiple observations made by the officers justified a stop. *See* Dkt. No. 45 at 12–13.

"The Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)); *see also Terry v. Ohio*, 392 U.S. 1, 21 (1968) ("[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."). "The Supreme Court has made clear that an officer's subjective thoughts play no role in the

Fourth Amendment analysis." *United States v. Ramirez*, 473 F.3d 1026, 1030 (9th Cir. 2007) (citing *Whren v. United States*, 517 U.S. 806, 811–13 (1996)). "So long as the facts known to the officer establish reasonable suspicion to justify an investigatory stop, the stop is lawful even if the officer falsely cites as the basis for the stop a ground that is not supported by reasonable suspicion." *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016). Still, "facts . . . unknown to the officer at the time of the intrusion" may not retroactively justify a stop. *Moreno v. Baca*, 431 F.3d 633, 639 (9th Cir. 2005).

To the extent that Mr. Russell argues that the officers did not have a basis for the traffic stop,[4] the Court rejects that argument and finds that the officers had at least one valid basis to activate their lights and initiate the stop: failure to visibly display a license plate, in violation of Seattle Municipal Code ("SMC") 11.22.080.[5] The fleet video plainly shows, and the Court finds, that Mr. Russell did not have a standard license plate affixed to the rear of his vehicle. Nor was his temporary plate visible to the officers, as his windows were so tinted as to obscure the presence of the plate. The officers acted appropriately in initiating a traffic stop to address this violation.[6]

Therefore, as to the basis for the stop, Mr. Russell's motion is DENIED.

---

[4] Mr. Russell does not further address this issue in his reply, nor did he raise the issue in oral argument at the evidentiary hearing.

[5] "Display requirements. No person shall operate any vehicle on any street or alley unless a valid license plate or plates are attached thereon as required by RCW 46.16A.200. The vehicle license plates shall be attached conspicuously at the front and rear of each vehicle for which the same are issued but if only one (1) license plate is legally issued for any vehicle such plate shall be conspicuously attached to the rear of such vehicle. Each vehicle license plate shall be placed or hung in a horizontal position at a distance of not more than four (4) feet from the ground and shall be kept clean so as to be plainly seen and read at all times; this requirement shall not apply in cases where the Washington state patrol has granted permission to deviate therefrom, as provided in RCW 46.16A.200." SMC 11.22.080(A).

[6] As the Court finds there was at least one basis for the stop, it does not need to address whether Mr. Russell was stopped in the roadway in front of the Comfort Inn, in violation of SMC Chapter 11.72.000.

ORDER ON MOTION TO SUPPRESS EVIDENCE AND FOR FRANKS HEARING - 8

B.  **Duration of the Stop**

"Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Moreover, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* Still, police officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). "It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Royer*, 460 U.S. at 500.

Here, the Court finds that the officers did not unreasonably extend the scope or duration of the stop. The officers were permitted to ask basic questions of Mr. Russell, including whether he had identification or whether he had any weapons in the vehicle, as well as running a search of his license. *See United States v. Taylor*, 60 F.4th 1233, 1239 (9th Cir. 2023) ("These are 'ordinary inquiries' incident to a traffic stop made as part of 'ensuring that vehicles on the road are operated safely and responsibly,' or else are 'negligibly burdensome precautions' that an officer may take 'in order to complete his mission safely.'" (quoting *Rodriguez*, 575 U.S. at 355–56)). The officers were also permitted to order Mr. Russell to step out of the vehicle. *See id.* at 1240.

1    Mr. Russell insists that the stop should have concluded when he pointed out his
2 temporary plate to Officer French (*see* Dkt. No. 35 at 13–17), but the officers were permitted to
3 further investigate the possibility of a marijuana DUI after smelling marijuana both upon
4 approaching the car and on Mr. Russell, as well as observing marijuana in the pocket of the
5 driver-side door. *Cf. United States v. Gearhart*, No. CR23-79, 2024 WL 2260859, at *4 (E.D.
6 Cal. May 17, 2024) (applying California law and finding that, "after smelling the odor of burnt
7 marijuana," officer was "justified in investigating further to determine whether [driver] was safe
8 to drive and whether the occupants of the car were engaged in any drug-related offenses"). The
9 officers' observations of marijuana justifiably transformed the stop from a traffic investigation to
10 a DUI investigation. Moreover, after returning from searching Mr. Russell's license, the officers
11 continued the stop for only about another two and a half minutes before making an arrest. In
12 total, the stop lasted approximately seven and a half minutes, which was not unreasonable under
13 the circumstances.

14   Therefore, as to the duration of the stop, Mr. Russell's motion is DENIED.

15 **C.    Searches of the Vehicle**

16   Mr. Russell argues that the officers engaged in multiple improper searches of the vehicle:
17 (1) Officer Lentz "physically intruded across the plane of the door multiple times" (Dkt. No. 35
18 at 19); (2) the officers "asserted total control over whether the driver's door was open or closed
19 throughout the stop, without asking for consent or having probable cause" (*id.* at 19–20); and
20 (3) Officer French "physically moved the driver's door" without authority or consent, which
21 enabled Officer Lentz to see the gun (*id.* at 20). The Government responds briefly to at least
22 some of this arguments, arguing that "[Mr. ]Russell, not the officers" took himself in and out of
23 the car and left the driver's door open. *See* Dkt. No. 45 at 16–17.

24

Warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *accord United States v. Wilson*, 13 F.4th 961, 971 (9th Cir. 2021) (observing "'the most basic constitutional rule' in the Fourth Amendment arena: warrantless searches are per se unreasonable, subject to few exceptions that are 'jealously and carefully drawn'" (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971))). A warrantless search is unreasonable—and therefore unlawful—unless an exception applies. *See, e.g.*, *United States v. Rodgers*, 656 F.3d 1023, 1027–31 (9th Cir. 2011) (finding warrantless search of vehicle unlawful where no probable cause that vehicle contained evidence of a crime).

One such exception is the "plain view" exception. "'[T]he police may seize any evidence that is in plain view during the course of their legitimate emergency activities.'" *United States v. Stafford*, 416 F.3d 1068, 1076 (9th Cir. 2005) (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)). For the plain-view doctrine to apply, officers cannot have violated the Fourth Amendment "in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136 (1990). Second, the item must be in plain view. *Id.* Third, the item's incriminating character must be immediately apparent. *Id.*

To the extent that the Government still asserts the plain-view exception as justification for seizure of the gun,[7] the Court rejects that argument and finds that the officers unlawfully searched Mr. Russell's vehicle because the officers violated the Fourth Amendment in arriving at the place where the gun was viewed. When Officer French returned to Mr. Russell's vehicle after

---

[7] In its response brief, the Government only briefly asserted the exception: "Officer Lentz observed a pistol in plain view while standing on Aurora Avenue outside of [Mr. ]Russell's Volvo." Dkt. No. 45 at 16. However, in oral argument at the evidentiary hearing, the Government did not address plain view in any way.

ORDER ON MOTION TO SUPPRESS EVIDENCE AND FOR FRANKS HEARING - 11

running a search of Mr. Russell's license, he pushed the driver door farther open than Mr. Russell had left it when he sat back down in the vehicle. But as discussed in the following section, Officer French did not have probable cause to arrest Mr. Russell or Mr. Russell's consent to push the door open any further than it stood at that time. *See Arizona v. Hicks*, 480 U.S. 321, 324–25 (1987) (holding that officer's moving of stereo equipment constituted a search requiring probable cause); *United States v. Washington*, 387 F.3d 1060, 1071 (9th Cir. 2004) (holding admission of drug possession permitted officers to see drugs in plain view but did not permit them to lift defendant's coat). Further, both officers testified that Officer Lentz did not see the gun until Officer French made this additional push. Thus, when Officer Lentz saw the gun, he was able to do so only because of Officer French's unauthorized push of the driver door; the push, and Officer Lentz's resulting view of the floor under the driver's seat, was an unlawful search.

Therefore, as to searches of the vehicle, Mr. Russell's motion is GRANTED, and all evidence of the gun is SUPPRESSED.[8] However, as explained below, the gun, the blood testing, and all other evidence recovered incident to his arrest must be suppressed for an additional, independent reason.

**D.    Probable Cause for Marijuana DUI**

Mr. Russell argues that the officers did not possess probable cause to arrest him for marijuana DUI at the time of his arrest. *See* Dkt. No. 35 at 20–21; Dkt. No. 48 at 6–8; *see also*

---

[8] Because the Court suppresses the gun on this basis, it need not reach Mr. Russell's additional search arguments regarding Officer Lentz's entry into the vehicle or his standing in the swing space of the driver door.

However, the Court notes that the evidence was inconclusive as to whether Officer Lentz leaned inside the vehicle: both officers testified that they could not determine if Officer Lentz had leaned inside the car, past the plane of the window. Officer Lentz testified that it was "possible" he did so, but he was not sure if he did. The video suggests that he may have done so. At any rate, Officer Lentz concedes that he was only able to see the gun *after* Officer French's unauthorized push of the door, suggesting that he did not learn anything from his flashlight-assisted looks into the car and making this potential search irrelevant.

Dkt. No. 78 (supplemental brief). Mr. Russell points to the Ninth Circuit's decision in *United States v. Patzer*, 277 F.3d 1090 (9th Cir. 2002), in which the court found no probable cause for a marijuana DUI arrest under Idaho law. In response, the Government does not address *Patzer*, instead pointing out the totality of circumstances present when the officers made their arrest. *See* Dkt. No. 45 at 18–20; *see also* Dkt. No. 77 (supplemental brief).

Probable cause is established "when, 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime.'" *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citation omitted). "To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *District of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotations omitted)). Courts follow a totality-of-the-circumstances test, "considering all of the surrounding circumstances" including the plausibility of any innocent explanations put forward. *Id.* at 588.

Mr. Russell was arrested for marijuana DUI, a violation of SMC 11.56.020. That statute states, in relevant part:

> A person is guilty of driving while under the influence of intoxicating liquor, cannabis, or any drug if the person drives a vehicle within the City:
>
> > a. And the person has, within two hours after driving, an alcohol concentration of 0.08 or higher, as shown by analysis of the person's breath or blood made under RCW 46.61.506;
> >
> > b. The person has, within two hours after driving, a THC concentration of 5.00 or higher as shown by analysis of the person's blood made under RCW 46.61.506;

     c. While the person is under the influence of or affected by intoxicating liquor, cannabis, or any drug; or

     d. While the person is under the combined influence of or affected by intoxicating liquor, cannabis, and any drug.

SMC 11.56.020(A)(1). The Seattle statute is "virtually identical" to its Washington State equivalent. *State v. Chambers*, 157 Wn. App. 465, 471 n.3, 237 P.3d 352 (2010); *see* RCW 46.61.502(1). The question is not simply whether a person drove after consuming intoxicating liquor, cannabis, or any drug but whether the person is impaired: a person is "under the influence or affected by" marijuana only if their ability to drive a motor vehicle "is lessened in any appreciable degree." 11A Wash. Prac., Pattern Jury Instr. Crim. WPIC 92.10 (5th ed.); *State v. Hurd*, 5 Wn.2d 308, 315, 105 P.2d 59 (1940).

  Here, the Court finds that the officers did not have probable cause to arrest Mr. Russell for marijuana DUI. While the Government offers a "constellation" of 10 "facts" in support of probable cause (*see* Dkt. No. 77 at 2–3), a close examination of these allegations reveals much less than first meets the eye.

  First, the Government points to Mr. Russell's alleged driving behaviors: (1) "stopping in a roadway outside a motel on Aurora Avenue (an area known with human and narcotics trafficking) . . . at 1:20–1:30 a.m."; (2) "failing to visibly display a temporary license"; (3) "tossing an item out the car's sunroof before stopping"; and (4) "failing to pull off the roadway." Dkt. No. 77 at 2.

  As an initial matter, there was no testimony (or evidence otherwise submitted) than any of these behaviors are *signs of impairment*, even if they amount to traffic violations or suspicion of other criminal activity. Further, the officers conceded that they did not observe Mr. Russell between 1:20 and 1:30 a.m., and thus cannot account for his location during that period. Officer French testified that it "looked like" Mr. Russell stuck his hand out of the sunroof to toss

something out, but the fleet video does not reflect any hands out of the sunroof, let alone an object being tossed. In his brief, Mr. Russell says he was raising his hands in a gesture of surrender, which is consistent with his behavior during the stop (that is, holding his hands where the officers could see them), and on his own body-camera video, Officer French is heard telling Officer Lentz (before exiting the vehicle to approach Mr. Russell) that he observed a hand, but he says nothing about an object being tossed.[9] Finally, Mr. Russell immediately explained to the officers that he moved his vehicle into the left-turn lane because he sought to pull over on a side street off Aurora; fleet video and body-worn camera videos reflect that Aurora was busy at the time, with multiple vehicles passing on the right side of Mr. Russell's vehicle. The officers admitted in testimony that there is no right-hand shoulder on Aurora for vehicles to pull over, but rather only parking lots and a bus lane. Plus, Mr. Russell properly signaled before moving into the left lane. Therefore, it was reasonable—and not a sign of impairment—that Mr. Russell did not pull over to the right side of Aurora given where his car was located at the time the police car lights were activated.

Second, the Government points to observations allegedly made by the officers during the traffic stop: (5) "Russell's car smelled strongly of marijuana"; (6) "[Mr. ]Russell's eyes were watery, bloodshot, and his eyelids were droopy"; (7) [Mr. ]Russell's person and clothing smelled of marijuana; (8) "[Mr. ]Russell admitted smoking marijuana as recently as two hours earlier, though his claims of consumption and timing were inconsistent"; (9) "an open bag of marijuana and a blunt were in the driver side door"; and (10) "[Mr. ]Russell became increasingly agitated

---

[9] Officer French also testified that if a driver smokes marijuana, they could just get rid of it by throwing it out the window. To the extent that Officer French may have suggested that Mr. Russell did just that, the Court notes that the windows of Mr. Russell's vehicle were, by the officers' own testimony, so tinted that they could not see inside the vehicle, making it impossible to tell whether Mr. Russell was smoking.

and belligerent, and he ultimately refused to walk to a sidewalk where in a typical DUI investigation officers would have conducted field sobriety tests." Dkt. No. 77 at 2–3.

The multiple observations (by sight or smell) of marijuana on Mr. Russell or in his vehicle, as well as Mr. Russell's admission of smoking marijuana, are all facts consistent with one simple conclusion: Mr. Russell consumed marijuana on the day of the stop. While this conclusion supported the officers' investigation of DUI, *see supra* Section III.B, it is not sufficient for probable cause. Indeed, Washington's pattern jury instruction notes that "[i]t is not unlawful" to consume marijuana "and drive a motor vehicle." WPIC 92.10. Indeed, "[t]he law recognizes that a person may have consumed" marijuana "and yet not be under the influence of it." *Id.* Further, the Court does not find Mr. Russell's purported inconsistencies to be of any significance. At different moments, he told officers that he had smoked "not in the last two hours," "a while [ago], maybe two, three hours," and "earlier in the day." These statements are not meaningfully inconsistent; in every case, Mr. Russell admitted smoking at least two hours prior to, and on the day of, the stop.

Beyond these observations, the officers also testified (and noted in their reports) that Mr. Russell's eyes were bloodshot and watery, and his eyelids were droopy. To the Court's eye, the body-worn camera video from both officers does not reflect these observations: while it is difficult to determine whether Mr. Russell's eyes were watery, Mr. Russell's eyelids do not appear droopy, nor his eyes bloodshot. And while Washington law requires marijuana in a vehicle to be unopened or, if opened, in the trunk or some other area of the vehicle not normally occupied or directly accessible by the driver or passengers, *see* RCW 46.61.745, a violation would only be an infraction, and here, Mr. Russell showed the officers that the blunt in the driver-side door was "not even smoked" and had "no fire to it."

The officers also testified that Mr. Russell was agitated and belligerent, and Officer French testified that he did not conduct field sobriety tests because there was something wrong with Mr. Russell's behavior. But in reviewing all the available video footage, the Court observes that Mr. Russell was clear, cogent, and firm in asserting his constitutional rights throughout the stop, and this Court will not condone the characterization of a person's insistence on their rights as belligerence. While Mr. Russell appeared irritated and frustrated with the stop, he did not physically resist the officers; further, he did not yell, use foul language, or otherwise escalate the situation. On the contrary, he asserted what he believed were his rights and expressed not only consent but a willingness to participate in any field sobriety tests the officers wished to conduct. He was clearly engaged, alert, and responded without delay to questions from the officers (even if he was also interjecting assertions of his rights). His speech was clear and firm, not slow, slurred, or mumbled. He made sure to keep his hands visible to the officers at all times. He also quickly and definitively retrieved his registration and insurance papers without fumbling around. All of these are signs that Mr. Russell was not impaired. Finally, when Officer French asked him to walk to the sidewalk, Mr. Russell stated that he first wanted to lock his vehicle, but he did not decline to participate. The simple fact is that Officer French never followed through on conducting the field sobriety tests. Mr. Russell never withdrew his consent or willingness to participate in the tests, and Officer French could have chosen to proceed with the tests instead of cutting short his investigation and placing Mr. Russell under arrest.

Ultimately, the Court is presented with two facts: (1) Mr. Russell consumed marijuana at least two hours before the stop; and (2) Mr. Russell may have had bloodshot, watery eyes and/or droopy eyelids. These facts put this matter on all fours with *Patzer*, where the driver was observed only to have "bloodshot and glassy eyes" and admitted to smoking marijuana. 277 F.3d at 1082. Under the Idaho law at issue in that case, the government was required to show that the

defendant was under the influence "to a degree which impairs the driver's ability to safely operate a motor vehicle." *Id.* at 1084 (quoting Idaho Code § 18–8004(5)). The Ninth Circuit concluded that the defendant's "driving and comportment did not evidence any impairment." *Id.* Here, too, the Court concludes that Mr. Russell's driving and comportment do not evidence any impairment such that his ability to drive was "lessened to an appreciable degree." WPIC 92.10. Notably, the Government has never addressed the relevance of *Patzer*, either in its briefing or in oral argument at the evidentiary hearing. While the officers were justified in investigating the *possibility* of marijuana DUI, they should have investigated further (*e.g.*, conducted sobriety tests) or released Mr. Russell instead of arresting him when they did. Therefore, the arrest was unlawful, and all evidence obtained as a result must be suppressed.

Finally, because the Court finds that the officers did not have probable cause to arrest Mr. Russell and suppresses evidence on this basis, it need not reach Mr. Russell's additional arguments regarding the search warrants and his request for a *Franks* hearing.

*   *   *

There is, of course, an elephant in the room (or vehicle): a gun—stolen, loaded with ammunition, and apparently fully functional (*see* Dkt. No. 45 at 9)—was recovered as a result of the traffic stop. And today's ruling excludes from trial this crucial evidence against Mr. Russell. But "while it is true that applying the exclusionary rule in this case will mean that a guilty defendant goes free, that is true of applying the exclusionary rule in essentially every case," and "[n]othing about this case calls for a remedy other than '[t]he typical remedy for a Fourth Amendment violation,' which 'is the exclusion of evidence discovered as a result of that violation from criminal proceedings against the defendant.'" *United States v. Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020) (quoting *United States v. Garcia*, 974 F.3d 1071, 1075 (9th Cir. 2020)). To bless the search and arrest in this matter would be to license the search and arrest of

virtually any driver in Seattle or Washington State who has merely consumed marijuana—a lawful act under local and state law—and driven a vehicle, regardless of the drug's actual effects on their ability to drive.

### IV. CONCLUSION

Accordingly, Mr. Russell's Motion to Suppress Evidence and for *Franks* Hearing (Dkt. No. 35) is GRANTED. Evidence of the gun, blood testing, and all other evidence recovered incident to Mr. Russell's arrest is SUPPRESSED.

Dated this 6th day of November 2024.

Tana Lin
United States District Judge